**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| PRE-PAID LEGAL | ) | |
| SERVICES, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-346-JHP |
| | ) | |
| TODD CAHILL, | ) | |
| | ) | |
|     Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pre-Paid Legal Services, Inc. ("PPLSI") initiated suit against Defendant Todd Cahill in the District Court of Pontotoc County based on claims of breach of contract, misappropriation of trade secrets, and tortious interference with contractual or business relations. *See*, Docket No. 2, Ex. A-1. While the case was still pending in Pontotoc County, PPLSI asked for and was granted a Temporary Restraining Order (TRO) prohibiting Defendant from contacting PPLSI associates to solicit or encourage them to join any new company or leave PPLSI. *See*, Docket No. 8, Ex. 1. The matter was removed to this Court on August 14, 2012. *See*, Docket No. 2. PPLSI then filed Plaintiff Pre-Paid Legal Services, Inc.'s Motion for Preliminary Injunction. *See*, Docket No. 11. The Court referred the Motion, *inter alia,* to the undersigned Magistrate Judge for a hearing pursuant to 28 U.S.C. § 636(b)(1)(B), and a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). *See*, Docket No. 19.

# I.     Facts

Pre-Paid Legal Services, Inc. ("PPLSI"), now known as LegalShield, sells legal service plans which gives members access to legal services.  When a member purchases a plan, they are given a toll free number to call to receive legal advice from certain law firms contracted with PPLSI.  *See*, Docket No. 25, p. 8.  Through the plan, members pay a monthly fee and are offered legal representation for a variety of subjects at either no additional cost or a discounted price.  *Id.*  PPLSI has executive offices in Dallas, Texas, operations offices in Ada, Oklahoma, and employs approximately 650 individuals, not including sales associates.  *See*, Docket No. 25, p. 10.

PPLSI operates under a network marketing sales model, which utilizes the services of sales associates, each of whom are independent contractors of PPLSI, to sell memberships and recruit new sales associates.  *See*, Docket No. 25, p. 10-11.  Those independent contractors are solely responsible for building their own "organization" or "team" by recruiting other sales associates, and those recruited (along with anyone brought into the organization by the recruit) then become part of the recruiter's "downline."  *See*, Docket No. 25, p. 11-12.  Associates are compensated for each sale made within the associate's downline.  *See*, Docket No. 25, p. 11.  Downline information is made available to PPLSI sales associates through their "back office."  The back office is a username and password protected site which contains information related to an associate's downline, including names, phone numbers, addresses, productivity levels, and activity levels, which "benefit[s] them in growing and maturing their team" and

allows associates to identify the most successful associates within their organization. *See*, Docket No. 25, p. 14, p. 18.

All individuals who wish to become PPLSI sales associates must submit a signed agreement entitled "Associate Agreement." *See*, Docket No. 25, p. 20. A copy of PPLSI's Policies and Procedures is attached to each agreement, and the agreement requires that prospective associates agree to abide by the terms delineated in the Policies and Procedures. *See*, Plaintiff's Exhibit 1. The Policies and Procedures identify downline information as "confidential, propriety information" that may not be used "for any purpose other than promoting PPLSI during or after his or her relationship with PPLSI." *See*, Plaintiff's Exhibit 1, Policies and Procedures, ¶ 8. Further, the agreement states that "[a]n Associate may not proselytize, recruit or solicit in any manner any PPLSI Associate, including without limitation his or her first line, into any other company or organization during the term of the Associate Agreement and for 2 years after the date of any termination hereof." *See*, Plaintiff's Exhibit 1, Policies and Procedures, ¶ 20. The word "solicit" is not defined in the Agreement.

PPLSI has a department of employees known collectively as "Associate Services," which focuses its efforts on resolving issues related to PPLSI's sales associates. Additionally, this department provides an avenue of communication between PPLSI's corporate offices and its sales associates. As such, associates are encouraged to call Associate Services when they have concerns regarding associates who are attempting to recruit PPLSI associates into other opportunities. When Associate Services receives an

associate complaint of this nature, an investigation is initiated and the offending associate's access to his back office is terminated. *See*, Docket No. 25, p. 10, p. 42-44.

Defendant Todd Cahill began working as a PPLSI sales associate in October 2004. Defendant quickly emerged as a top PPLSI sales associate and built a sizable downline of approximately 25,000 individuals in the Southern California area. *See*, Docket No. 25, p. 21, p. 27. On April 19, 2008, Defendant Cahill was promoted to the position of Regional Manager assigned to certain zip codes within the Southern California area, which made him responsible for all activity in those zip codes whether the individual sales associate was a member of his organization or not. *See*, Plaintiff's Exhibit 2; Docket No. 25, p. 31-32. Additionally, he was later named the Regional Vice President ("RVP") of Illinois. As RVP of Illinois, Defendant was responsible for overseeing the regional managers in the state of Illinois. *See*, Docket No. 25, p. 31. Both of those positions gave Defendant greater access, or an "enhanced back office," to associate information. *See*, Docket No. 25, p. 32. At that time, Defendant Cahill signed PPLSI's "Regional Manager Agreement." *See*, Plaintiff's Exhibit 2.

Relevant to this dispute, the Regional Manager Agreement ("RMA") identifies the following information as "Trade Secrets and Confidential Information":

> (i) identity and success of sales associates and/or key personnel (ii) individual members and group marketing methods, plans and policies [and] commission arrangements; (iii) contract persistency; (iv) the Company's processes, methods and techniques for the recruiting, training and monitoring of sales associates; (v) information regarding methods to build a marketing network, including solicitation methods; (vi) data regarding plan usage; (vii) regulatory information regarding qualification of plans; (viii) contract design, costs, financial information, business strategies and other

aspects of the Business; and (ix) the Company's systems to gather and/or report any or all of the foregoing information.

*See*, Plaintiff's Exhibit 2, ¶ 6. The RMA goes on to prohibit the disclosure or dissemination of any confidential materials and requires the return of all confidential information to PPLSI following termination. *See*, Plaintiff's Exhibit 2, ¶ 6.1. In addition, the RMA contains a non-solicitation clause which states that

the Regional Manager shall not, without the prior consent of the Company: . . . (c) directly or indirectly solicit, entice, persuade or induce any individual who presently is, or at any time during such period shall be, an employee, sales associate or member of the Company or subsidiary or affiliate of the Company, or any of their respective successors, to terminate or refrain from renewing or extending his or her employment, association or membership with the Company or subsidiary or affiliate of the Company, or any of their respective successors, or to become employed by or enter into a contractual relationship with REGIONAL MANAGER or any business with which REGIONAL MANAGER is affiliated.

*See*, Plaintiff's Exhibit 2, ¶ 7. Both the Associate Agreement and the RMA contain arbitration clauses.

During his time with PPLSI, Defendant initiated several programs within his organization to cultivate and encourage other PPLSI sales associates to achieve greater sales and productivity. One of those programs was the "Elite Leaders Program," also known as "ELP," which included PPSLI associates identified by Defendant as outstanding. *See*, Docket No. 25, p. 107-08. ELP was utilized by Defendant for several purposes: to facilitate associate growth, educate associates regarding effective sales methods and practices, and motivate associates to strive for more productivity. As part of the ELP, Defendant hired David Byrd to provide business mentorship to associates so that they could effectively grow within PPLSI. *See*, Docket No. 25, p. 108. On August

10, 2012, Defendant called a meeting (the "ELP Meeting") of ELP members only, under the guise that it was a planning (or "mastermind") session, at an unnamed hotel. *See*, Docket No. 25, p. 120.

On that same day, Defendant also initiated a private meeting between himself and fellow PPLSI sales associate Michael Cabradilla, who was a member of both Defendant's downline and ELP, immediately prior to the ELP Meeting. Defendant told Cabradilla that morning that he needed to meet with him "as a ring earner to go over some insights before [the] crew comes at 1 pm." *See*, Plaintiff's Exhibit 20. Cabradilla testified that once he arrived at the hotel, Defendant revealed his plans to leave (and reasons for leaving) PPLSI to go to Nerium, another multi-level marketing company that sells skin care, that Nerium wanted Cabradilla to work for them and would guarantee a salary of $10,000 per month, and offered Cabradilla an opportunity to go with him. *See*, Docket No. 25, p. 127-30. Defendant also informed Cabradilla that Scott and Kacy Christiansen, both members of Defendant's ELP program, were leaving PPLSI for Nerium.[1] At the conclusion of the private meeting, Defendant requested that Cabradilla send him an email inquiring about Nerium. *See*, Docket No. 25, p. 131. Cabradilla did not send such an email. *Id.*

Cabradilla and PPLSI associate Kelly Feest both testified as to the ELP Meeting held on August 10, 2012. Cabradilla stated that upon entering the room (and while Defendant was not present), he informed his fellow ELP members to "keep [their] guard

---

[1] Cabradilla testified that he was unsure as to who had recruited Scott and Kacy Christiansen into Nerium. *See*, Docket No. 25, p. 178-79.

up" in an effort to forewarn those present that they may not be at the meeting for PPLSI business. *See*, Docket No. 25, p. 134. Once Defendant arrived, he announced to the room that he was leaving PPLSI because he no longer believed in the company, did not think associates could be successful, and he was going to another business; there is no indication that Defendant mentioned Nerium by name. *Id.* Cahill did, however, tell those present that anyone interested in where he was going and what he was doing should email him. *Id.* Cabradilla testified that Defendant's announcement generated mostly angry reactions. Docket No. 25, p. 134-35.

PPLSI sales associate Kelly Feest testified that she worked with Cahill on a daily basis and described Cahill as her "leader." *See*, Docket No. 25, p. 197. Defendant asked Ms. Feest each week about top performers within her organization in an effort to both encourage continuous growth within his own organization and to help Ms. Feest maintain success within Ms. Feest's downline. *See*, Docket No. 25, p. 186. Following the ELP Meeting, Ms. Feest reported the incident to Associate Services and made them aware that Defendant had called the ELP Meeting where he announced that he was leaving PPLSI and would be "switching companies." *See*, Docket No. 25, p. 202. Both Cabradilla and Feest testified that Josh Waxman was the only individual present at the meeting who had signed up with Nerium since the ELP Meeting. *See*, Docket No. 25, p. 171, p. 215.

Following the ELP Meeting, Defendant sent an email to PPLSI notifying them that he was resigning his position as RM in the San Diego area and RVP of Illinois. *See*, Plaintiff's Exhibit 10. At that time, Defendant's access to his back office was terminated, and his sales associate account was put on hold. *See*, Docket No. 25, p. 53, p. 86. PPLSI

did not present any evidence that Defendant still had access to downline or any other trade secret information in any form.

On August 13, 2012, Defendant posted general information about Nerium on the private "LS San Diego" Facebook page, the "Elite Leaders" page, and the "NewFreedom Champions" page, all Facebook pages Defendant had created as part of his mentorship to PPLSI sales associates in the San Diego area. *See*, Plaintiff's Exhibit 21, Exhibit 22, & Exhibit 23. Defendant has apparently not posted on any of the private Facebook groups since August 13, 2012. In addition, Defendant has been actively posting information and events related to Nerium on his personal, public Facebook page. *See*, Plaintiff's Exhibit 30.

## II.     Analysis

"A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984), *citing United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). "The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case." *Tri-State Generation and Transmission Association, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986), *citing Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975). *See also*, *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992), *quoting Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). In order for a preliminary injunction to issue, the movant must satisfy a four-part test:

The requesting party must demonstrate (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest.

*Prairie Band of Potawatomie Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).[2]

**Misappropriation of trade secrets**

PPLSI argues that Defendant Cahill has violated Oklahoma's Uniform Trade Secrets Act (OUTSA) by using downline information to solicit and recruit the most successful PPLSI sales associates to join his new multi-level marketing company, Nerium. PPLSI argues that "[b]ecause the associates are the backbone of LegalShield's Membership sales and marketing, the injury caused by Defendant's use of trade secret information to recruit them away will irreparably injure LegalShield's market position if allowed to continue." *See*, Docket No. 11, p. 11-12.

In order to prevail on this claim, PPLSI must prove by a preponderance of the evidence the following elements: (1) the existence of a trade secret; (2) misappropriation of the secrets by Defendant; and (3) use of the secrets by the Defendant to the Plaintiff's

---

[2]    PPLSI is correct in articulating the relaxed standard for likelihood of success on the merits "[w]here the moving party has established that the three 'harm' factors tip decidedly in its favor[.]" *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 653 (10th Cir. 2004) [internal citations omitted]. Where the movant makes such a showing, "[t]he movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Id.*, *quoting Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). However, as discussed *infra*, the undersigned is not convinced that PPLSI has made the requisite showing for the element of irreparable harm with respect to the claim of misappropriation of trade secrets and breach of the non-solicitation agreement regarding Defendant's Facebook posts. Thus, the relaxed standard is inapplicable with respect to those claims.

detriment. *Pre-Paid Legal Services, Inc. v. Harrell*, 2008 WL 111319, *10 (E.D. Okla. Jan. 8, 2008), *citing Micro Consulting, Inc. v. Zubeldia*, 813 F. Supp. 1514, 1534 (W.D. Okla. 1990). A "trade secret" is defined by Oklahoma law as "information, including a formula, pattern, compilation, program, device, method, technique or process that:

    a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

    b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Okla. Stat. tit. 78, § 86(4). Further, misappropriation is defined by statute as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use[.]" 78 Okla. Stat. § 86(2)(b)(2)(b).

    Defendant has not argued that the downline information that PPLSI cites do not constitute trade secrets. Instead, Defendant argues that he is not in possession of, nor does he have access to, any trade secret information and consequently, is unable to and has not misappropriated any such information. The undersigned Magistrate Judge agrees that PPLSI has not shown that Defendant is in possession of any trade secret information. The court has ordered preservation of all evidence currently in existence. *See*, Docket No. 22. Further, the parties indicated at the evidentiary hearing that they are cooperating in retrieving any trade secret information that may be in Defendant's possession through

a third-party review of his electronic devices. *See*, Docket No. 25, p. 282-83. Most importantly, PPLSI has not made a showing that if the preliminary injunction does not issue, it will suffer irreparable harm, as they presented no evidence that any sales associate (besides Michael Cabradilla, who is discussed *infra*) has even been *contacted* by Defendant since his resignation from PPLSI, which suggests that Defendant is *not*, in fact, using *any* trade secret information gleaned from his time at PPLSI.

Further, even if the undersigned agrees that Defendant arguably misappropriated trade secrets by calling the mastermind meeting with the intent to announce his departure from PPLSI (thereby satisfying the element of likelihood of success on the merits), any injunction that would issue on that basis would be to remedy a past harm as opposed to preventing future harm. *See, Schrier v. University of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."), *citing Heideman*, 348 F.3d at 1189 ("[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."). The undersigned finds that PPLSI has failed to show that it will suffer irreparable harm should an injunction not issue on this claim due to the fact that Defendant has indicated his willingness to cooperate with discovery related to his electronic devices *and* that the alleged misappropriation, *i. e.*, the use of trade secret information to call individuals to a meeting wherein he announced his departure from PPLSI, was a single event that PPLSI has not shown is likely to reoccur.

**Non-Solicitation Clause**

PPLSI next argues that it is entitled to a preliminary injunction due to Defendant Cahill's breach of the non-solicitation clause in the RMA. The non-solicitation clause states that:

> [T]he Regional Manager shall not, without the prior consent of the Company: . . . (c) directly or indirectly solicit, entice, persuade or induce any individual who presently is, or at any time during such period shall be, an employee, sales associate or member of the Company or subsidiary or affiliate of the Company, or any of their respective successors, to terminate or refrain from renewing or extending his or her employment, association or membership with the Company or subsidiary or affiliate of the Company, or any of their respective successors, or to become employed by or enter into a contractual relationship with REGIONAL MANAGER or any business with which REGIONAL MANAGER is affiliated.

Plaintiff's Exhibit 2. As support, PPLSI cites the solicitation of Michael Cabradilla prior to the ELP Meeting and several posts on Defendant Cahill's personal Facebook page[3] as evidence of ongoing solicitation of current PPLSI associates.

---

[3] PPLSI also argued that invitations sent to PPLSI employees and sales associates to join Twitter should be considered solicitations in violation of the non-solicitation agreement. But the exhibits are merely general invitations to join Twitter. The exhibits do not demonstrate that the invitations either request the target to "follow" Defendant's Twitter feed or contain any information whatsoever about PPLSI *or* Nerium. PPLSI's counsel mentioned at the hearing that they believed that Defendant had generated an e-mail blast to a number of PPLSI employees and associates to join Twitter, *see*, Docket No. 25, p. 93, but the undersigned does not find this plausible. First, Twitter sends the invitations on behalf of users, which suggests that Defendant had no knowledge as to when the invitations would be sent. See, Ex. 11, p. 2 ("This message was sent by Twitter on behalf of Twitter users who entered your email address to invite you to Twitter."). Second, four of the eight Twitter invitations of record sent to associates and employees mention multiple Twitter users who have invited the target recipient to join Twitter. If Defendant had sent a targeted email blast, it seems highly unlikely that such a blast would coincide so precisely with other Twitter users inviting those target recipients. Next, the undersigned finds it implausible that Defendant would have included both the CEO and general counsel of PPLSI in any e-mail blast designed to solicit sales associates to join Nerium. Finally, each of the invitations were sent on different dates.

### The non-solicitation agreement is not a restraint of trade

Defendant Cahill first argues that the non-solicitation clause is unenforceable under Okla. Stat. tit. 15, § 217 as a restraint of trade. Okla. Stat. tit. 15, § 217 applies only to contracts "'by which any one is restrained from exercising a lawful profession" which expressly implicates non-compete agreements. *See Pre-Paid Legal Services, Inc. v. Worre*, 2006 WL 3227903, *5 (W.D. Okla. Nov. 3, 2006). The non-solicitation clause at issue here does not prevent Defendant Cahill from competing with Pre-Paid Legal, and "it does not restrain trade by prohibiting [Defendant] from exercising his lawful profession." *Worre*, 2006 WL 3227903 at *5. *See also, Pre-Paid Legal Services, Inc. v. Harrell*, 2008 WL 111319, *10 (E.D. Okla. 2008). ("The non-solicitation clause in the RVP Agreements is also enforceable under Oklahoma law. The clause is not a restraint of trade as that term is defined in Okla. Stat. tit. 15, § 217. The clause does not relate to or involve competition with Pre-Paid and does not prevent the Harrells from exercising any lawful profession."). The undersigned therefore finds that the non-solicitation agreement is not a restraint of trade under Oklahoma law.[4]

### Solicitation of Michael Cabradilla

Turning to the merits of PPLSI's breach of contract claim, the undersigned Magistrate Judge agrees with PPLSI that it is likely to succeed on the merits of the claim that Defendant breached the non-solicitation clause by privately meeting with Michael

---

[4] Aside from the argument that the non-solicitation agreement is void as a restraint of trade under Oklahoma law, Defendant does not argue that the non-solicitation agreement was not a valid contract.

Cabradilla in an attempt to recruit him to join Nerium prior to the August 10, 2012 meeting. Defendant has not seriously disputed that the private meeting between himself and Cabradilla was not a solicitation. Defendant clearly targeted and initiated contact with Cabradilla in an effort to convince him to join Nerium, going so far as to offer Cabradilla a guaranteed salary of $10,000 per month and asking him to go with him to Nerium.

Further, the undersigned finds that should Defendant be permitted to breach the non-solicitation agreement in this manner, PPLSI will suffer irreparable harm. While PPLSI has not shown that Defendant has made initial contact with any other PPLSI sales associate since the August 10, 2012 meeting, the fact that Defendant continued to send text messages to Cabradilla after he rejected his offer to go to Nerium combined with the fact that Defendant is engaged in another multi-level marketing company and will need to recruit sales associates to Nerium in the San Diego market shows that PPLSI faces a significant risk that Defendant will solicit current PPLSI associates if he is not enjoined from initiating contact with current PPLSI associates. *See*, *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (Cases elaborating on the level of risk required to make a showing of irreparable harm "hold that an injury is not speculative simply because it is not certain to occur. An 'irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"). Next, the undersigned finds that the harm to the Defendant in being enjoined from initiating contact with PPLSI

is minimal. Defendant will still be able to recruit sales associates to Nerium and build his business. The only restriction Defendant will face is that he will be required to abide by the contractual provisions that he *agreed* to at the start of his association with PPLSI. Finally, the public interest is promoted through the judicial enforcement of valid contracts. Thus, the undersigned finds that PPLSI has successfully satisfied each of the four requirements for the issuance of a preliminary injunction on this issue, and recommends that a preliminary injunction should issue barring Defendant from initiating contact with PPLSI sales associates in an effort to solicit them to join Nerium.

### Facebook posts as solicitations

PPLSI also cites certain Facebook posts as evidence of Defendant's ongoing solicitation of PPLSI associates which will result in irreparable harm to PPLSI's business in the absence of an injunction. The rather novel issue, then, is whether Defendant's Facebook posts on his public, personal account constitute solicitations under the terms of the non-solicitation agreement. While there is no controlling authority dealing squarely with the interplay between social media and solicitation, there is *some* guidance in the case law.[5]

The facts of this case are analogous to *Enhanced Network Solutions Group, Inc. v. Hypersonic Technologies Corp.*, 951 N.E.2d 265 (Ind. Ct. App. 2011), in which an Indiana court found that posting an employment opportunity on a LinkedIn website that

---

[5] It should be noted that *neither* party addresses the issue of whether Defendant's Facebook posts are solicitations in violation of the non-solicitation agreement under the law.

would be viewed by a contractually prohibited class did not constitute solicitation. In *Enhanced Network Solutions Group*, two software companies entered into a subcontracting agreement in which Plaintiff ENS, an advanced software engineering company, and Defendant Hypersonic, a software modification company, agreed that ENS would utilize Hypersonic for services to better serve their own customers. In that agreement, the companies also agreed that they would "refrain from soliciting or inducing, or attempting to solicit or induce, any employee of the other Party in any manner that may reasonably be expected to bring about the termination of said employee toward that end[.]" *Enhanced Network Solutions Group*, 951 N.E.2d at 267. During the contractual period, Hypersonic posted an employment opportunity on its LinkedIn page that could be viewed by those belonging to "a certain public group within LinkedIn" which apparently included a number of ENS employees. *Id.* Consequently, an ENS employee, Dobson, saw the posting and informed the President of Hypersonic that he was interested in the position. *Id.* After a series of meetings between Dobson and Hypersonic executives, Dobson was offered and accepted the position with Hypersonic. The court found that the posting on LinkedIn did not constitute solicitation under the agreement, because the Hypersonic employee "made the initial contact with Hypersonic after reading the job posting on a publicly available portal of LinkedIn." *Id.* at 268. The court also noted that should ENS want to eliminate the possibility of similar conduct in the future, ENS should provide a definition of "solicit" in future agreements that clearly specifies the kind of activity they wish to prohibit. *Id.* at 269, fn. 1.

In addition, a Massachusetts state court recently addressed the issue of whether Facebook posts announcing a new employment situation and "friending" clients of a past employer violated an employee non-solicitation agreement. In *Invidia, LLC v. DiFonzo*, 2012 WL 5576406 (Mass. Super. Oct. 22, 2012), Plaintiff, a hair salon, commenced suit against Defendant, a hair stylist formerly employed by Plaintiff, for, *inter alia*, breach of a non-solicitation provision in an employment contract. Plaintiff alleged that the following evidence proved that Defendant was actively soliciting Plaintiff's clients: 1) a post written by Defendant's new employer, David Paul Salons, on Defendant's personal Facebook page in which David Paul Salons publicly announced Defendant's employment with them and to which one of Plaintiff's clients commented about an upcoming appointment and 2) the fact that Defendant had become Facebook friends with eight of Plaintiff's clients since leaving. *DiFonzo*, 2012 WL 5576406 at *5-6. With regard to the announcement post written by David Paul Salons, the court stated that "it does not constitute 'solicitation' of [Plaintiff's] customers to post a notice on Ms. DiFonzo's Facebook page that Ms. DiFonzo is joining David Paul Salons." *Id.* The court went on to state that "one can be Facebook friends with others without soliciting those friends to change hair salons, and [Plaintiff] has presented no evidence of any communications, through Facebook or otherwise, in which [Defendant] has suggested to these Facebook friends that they should take their business to her chair at David Paul Salons." *Id.* at *6. Finally, while Plaintiff argued that Facebook was heavily utilized as a communications tool between itself and its clients, the court indicated that if Plaintiff's clients located Defendant through Facebook and reached out to her first, there would be no violation of

the non-solicitation provision.  *Id.* at *6.  Thus, the court denied the Plaintiff's request for preliminary injunction.

In this case, PPLSI complains that Facebook posts that tout generally the benefits of Nerium as a product and Defendant's professional satisfaction with Nerium constitute solicitations presumably because some of Defendant's Facebook "friends" are also PPLSI sales associates and may view Defendant's posts.  But Defendant's actions in this case are less explicitly inviting professional interest in Nerium than the act of posting a job opportunity on a social networking page that could, and likely would, be viewed by employees that an individual was contractually prohibited from soliciting which is what occurred in *Enhanced Network Solutions Group*.  951 N.E.2d 265.  Further, Defendant's posts on his personal Facebook page are similar to the Facebook announcements that were not found to be solicitations in *DiFonzo*.  2012 WL 5576406.

PPLSI argues that this case is "virtually identical" to *Neways Inc. v. Mower*, 543 F. Supp. 2d 1277 (D. Utah 2008), regarding the facts surrounding the element of irreparable harm.  However, a review of *Neways, Inc.* reveals that the conduct engaged in by the defendants, consisting of former distributors of a multi-level marketing company, and the results achieved through that conduct was *far* more extensive than both the conduct and results achieved in this case.  In *Neways, Inc.*, the court found that the defendants had engaged in ongoing efforts to recruit Plaintiff's distributors, including the following: i) speaking to and meeting with several of Plaintiff's distributors about Sisel, Defendants' new marketing company, who were "encouraged to join Sisel and [were]

now members of . . . Sisel"; ii) organizing and participating "in a series of meetings . . . for the purpose of providing Neways distributors with information about Sisel"; and iii) signing up a number of current or former Neways distributors to join Sisel distributors' downlines.[6] *Id.* at 1286-87. Based on the evidence showing those things, the court stated that the plaintiff had shown that "a significant number of its established distributors [had] already been recruited to join [Defendant] as a result of improper recruiting activities that [had] involved the disavowal of contractual obligations and the use of confidential trade secret distributor information belonging to [Plaintiff]." *Id.* at 1289.[7]

In this case, the evidence at this point merely shows that Defendant called a meeting to announce his departure (while clearly deceiving others regarding the purpose of the meeting), solicited a single PPLSI sales associate prior to that meeting, and posts information on his publicly available Facebook page touting both the benefits of Nerium

---

[6]     The court in *Neways, Inc.* noted that one of the distributors, Egashira, "testified that he had a 'vague impression' that approximately seventy percent of the distributors in his Sisel downline were current or former Neways distributors." *Neways, Inc.*, 543 F. Supp. 2d at 1287.

[7]     PPLSI also cites *Pre-Paid Legal Services, Inc. v. Harrell*, 2008 WL 111319 (E.D. Okla. Jan. 8, 2008), for support that a preliminary injunction should issue in this case because the conduct of defendants in that case is similar to Defendant's conduct here, but *Harrell*, too, involved entirely different facts. In *Harrell*, the defendants solicited several Pre-Paid Legal associates to different multi-level marketing companies from the fall of 2003 through trial, which was held from May 30, 2007 through June 5, 2007. The solicitation of Pre-Paid Legal associates continued despite that fact that Pre-Paid Legal had issued a letter to the defendants demanding that they cease solicitation of Pre-Paid employees, associates, or independent contractors, and the solicitation did not stop even while the defendants were in the midst of a trial. *Id.* at *12 ("Pre-Paid first sought injunctive relief on November 9, 2005, when it filed its state-court petition, which was later removed to this Court. The Harrells have continued to violate the non-solicitation clause during the pendency of this litigation. The cumulative and ongoing nature of Defendants' solicitation indicates Defendants should be permanently enjoined from misappropriating Pre-Paid's trade secrets.").

products and his professional satisfaction with Nerium.[8]  PPLSI has not shown any intent

on Defendant's part to solicit current PPLSI associates beyond the single effort related to

Cabradilla, which occurred before his resignation from PPLSI.  Further, PPLSI has not

shown that it is likely to succeed on the merits of the breach of contract claim regarding

Defendant's Facebook posts or that it will suffer irreparable harm if Defendant is not

enjoined from posting on his Facebook wall regarding Nerium.  There was no evidence

presented that Defendant's Facebook posts have resulted in the departure of a single

PPLSI associate, nor was there any evidence indicating that Defendant is targeting PPLSI

sales associates by posting directly on their walls or through private messaging.

In addition, much of what PPLSI presented indicated that regardless of

Defendant's actions, the San Diego market would have been disrupted.  Defendant was a

high profile member of PPLSI who was very engaged in the San Diego market.  On his

own initiative, Defendant created mentorship groups to encourage the success of both

PPLSI and PPLSI sales associates.  It is quite reasonable to find that his mere departure

would have led to confusion  and interest among associates in his downline, particularly

among those who were members of the mentorship groups he created.  Finally, PPLSI's

own witnesses testified that disruption would have resulted due to Defendant leaving

---

[8]      Dr. Lawrence Chonko testified that Defendant's use of negative posts about PPLSI would
be targeting PPLSI sales associates as a step in the solicitation process.  *See*, Docket No. 25, p.
272-73.  A review of Defendant's Facebook page, *i. e.*, Exhibit 30 (which was the only exhibit
admitted as a true representation of Defendant's Facebook page), reveals that Defendant's only
mention of PPLSI was in response to an individual questioning his integrity and those posts
stated the following: 1) "What if what you held true about the vision of [PPLSI] was lost for
reasons I can't say here?" and 2) "Would I be a man of integrity to stay if I didn't believe in my
heart my people could really make it?"  The undersigned does not find these posts which were in
response to an attack on his character to be necessarily negative towards PPLSI.

PPLSI.  PPLSI's expert witness, Dr. Lawrence Chonko, testified that the mere *awareness* of Defendant's departure would have created interest among members of his downline. *See*, Docket No. 25, p. 248. ("Well, as I understand it, if I become aware of something – so in this case, Mr. Cahill leaving Pre-Paid to go somewhere else – and if I were a member of his downline, that would get my interest, I would think.").  And PPLSI representative Melanie Lawson similarly testified that when a high-profile associate like the Defendant leaves PPLSI, "[i]t causes great disruption in the field, in the home office, it basically takes everybody's focus off what should be occurring which is your regular operations." *See*, Docket No. 25, p. 64.

## III.    CONCLUSION

In summary, the undersigned finds that Plaintiff has shown that it is entitled to a preliminary injunction on the claim of breach of the non-solicitation agreement with respect to Michael Cabradilla.  The undersigned therefore RECOMMENDS the issuance of a preliminary injunction barring the Defendant from initiating contact with current PPLSI sales associates or employees.  The preliminary injunction should be valid until the issues can be presented to the arbitrators for consideration.  Further, the undersigned finds that Plaintiff has failed to show that it is entitled to a preliminary injunction on the claims of misappropriation of trade secrets and breach of the non-solicitation agreement regarding the content that has been posted on Defendant's personal Facebook page.

The undersigned therefore PROPOSES the findings set forth above and RECOMMENDS that Plaintiff Pre-Paid Legal Services, Inc.'s Motion for Preliminary

Injunction [Docket No. 11] be GRANTED IN PART and DENIED IN PART. Regarding the other motions referred to the undersigned Magistrate Judge herein, IT IS HEREBY RECOMMENDED that: (i) the Motion to Dissolve or Modify Temporary Restraining Order [Docket No. 4], the Motion to Extend Temporary Restraining Order [Docket No. 8], and the Motion for Expedited Ruling On Plaintiff's Motion to Extend Temporary Restraining Order and for Expedited Discovery [Docket No. 10] should be DENIED as moot, as the temporary restraining order issued by the state court expired by its own terms prior to the hearing on the motion for preliminary injunction; (ii) the Motion for Expedited Discovery [Docket No. 9] should be GRANTED to the extent the parties announced they are conducting limited discovery by agreement, but otherwise DENIED; and, (iii) the Expedited Motion to Stay Pending Arbitration [Docket No. 13] should be GRANTED, as the parties agree the case should be submitted to arbitration. Objections to this Report and Recommendation must be filed within fourteen days. *See* 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72.

IT IS SO ORDERED this 22nd day of January, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma